UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04-10297-RWZ |
|  | ) |  |
| v. | ) | VIOLATIONS: |
|  | ) |  |
| NICOLE N. BARTLETT, | ) | 18 U.S.C. § 513 (a) |
|  | ) | (Making, Possessing, Uttering |
| Defendant | ) | Forged Securities) |
|  | ) |  |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States submits this memorandum in advance of the May 10, 2005 sentencing of Nicole N. Bartlett ("Bartlett"). Bartlett pleaded guilty on January 6, 2005 to counts 1-9 of the above-referenced Information charging her with making, possessing, and uttering forged securities, in violation of 18 U.S.C. § 513(a).

**I.   Factual Background**

The facts summarizing Ms. Bartlett's theft scheme are thoroughly vetted in the Presentence Report and there are relatively minor material disputes. They will not be repeated in detail herein.

In short, during the three and one half years Nicole Bartlett was employed at The Children's Museum as its payroll supervisor, she stole from the museum and her fellow employees using a fairly elaborate scheme involving the ADP payroll system. In total, by anyone's calculation, the loss to the museum alone exceeded a quarter of a million dollars – a hefty supplemental income to Bartlett's legitimate income of slightly less than $30,000 from The

Children's Museum.

In the government's view, central to understanding this defendant and the motivation for her crime, is understanding what she did with the money she stole. What did Nicole Bartlett do with all this money? Here, the answer is quite simple. She used the money not as a last resort to pay for expenses as a result of her budget conscious husband as she initially told USPO Victoria (see PSR ¶ 55), not simply to pay for routine household bills that her "withholding and controlling" husband would not pay as she told Dr. John Daignault (the Guardian ad Litem ("GAL"), GAL Report, page 4), and not for "necessary household items as well as small personal issues" such as getting her morning coffee as she told Dr. Kelly (Report of Dr. Martin Kelly dtd 5/4/05, page 4) and Dr. Brugnoli (id. at page 6). Rather, she used the money to live a lifestyle far beyond that which she could afford as a part-time employee at a non-profit museum. Her lifestyle included excessive spending at high-end retailers for clothing and cosmetics, including, Filenes, Macys, Victorias Secret, Gap, and Aveda. Her lifestyle included frequent ATM cash withdrawals, typically in hundred dollar increments. Her lifestyle further included frequent debit card withdrawals and check withdrawals that were excessive in frequency and amount. In short, Ms. Bartlett's spending comprised repeated, day-to-day charges which can only be considered luxuries for anyone making a salary of $30,000 per year. The fact that her then husband tried to take steps to reign in her spending is plainly understandable when you review the level of excessive spending readily apparent in this case. Attached as Exhibit A to this memorandum is a detailed chart summarizing the bank account activity, specifically the debits, from Ms. Bartlett's accounts at Rockland Federal Credit Union and Abington Savings Bank, on the accounts in which stolen funds were deposited.

## II. Application of Sentencing Guidelines

As set forth in the plea agreement, the parties stipulate that the guidelines calculations should be performed pursuant to the Manual in effect at the time of the offense (November 1, 2002); that the applicable provisions is U.S.S.G. §§ 2B1.1; that the loss resulting from the defendant's scheme exceeded $200,000; and that the defendant abused a position of trust in committing the offense. (See Plea Agreement ¶ 3).

The foregoing stipulations yield the following guidelines computation:

| | | |
|---|---|---|
| Base Offense Level | 6 | U.S.S.G. § 2B1.1(a) |
| Increase for loss | 12 | U.S.S.G. § 2B1.1(b) |
| Increase for abuse of position of trust | 2 | U.S.S.G. § 3B1.3 |
| **SUBTOTAL** | **20** | |

In the plea agreement, the parties agreed to disagree with regard to the calculation of the number of victims, and further agreed to let the sentencing judge make that determination applying the preponderance of the evidence standard. Under paragraph 3(c) of the agreement, at sentencing the government will take the position that the offense involved more than 50 victims and the defendant will take the position that the offense involved more than 10, but less than 50, victims. By the government's calculation, adding 4 points for more than 50 victims, results in a total offense level of 24, minus 3 points for acceptance of responsibility, resulting in a final offense level of **21**.

The victims in this case fall into at least three categories.[1] First, the institutional victim, The Children's Museum. Second, the so-called "tax withholding victims," individuals for whom Ms. Bartlett directed the debiting of the amount of money paid into their tax withholding thereby lowering the amount reported as taxes paid to the IRS. There are at least 32 victims included in this group. The third group comprises victims of the duplicate checks portion of the scheme. These individuals undoubtably sustained a loss, as a result of tax implications of the IRS/state taxing authorities being told that they received more income than they actually received. As to these victims, although the loss can not be readily calculated, the most clear-cut victims among this group are those from whom Ms. Bartlett directed that no income taxes should be withheld from the ADP checks she stole. A detailed listing of an additional 28 victims for which no taxes were withheld from checks stolen by Ms. Bartlett were attached to the government's March 23, 2005 submission to the USPO at Tab B.[2] Even adding only this limited number of the more than 200 victims of the duplicate check scheme yields an overall victim number greater than 50.

The Probation Department concurs with the government's calculation of the offense level, including its determination of the number of victims. (PSR ¶ 35).

Bartlett is in Criminal History Category I. (PSR ¶ 39). With an adjusted base offense

---

[1] The term "victim" is defined under 18 U.S.C. §3663A(1)(2) to mean "a person directly and proximately harmed as a result of the commission of an offense . . . ." 18 U.S.C. §3663A

[2] By letter dated 5/4/05, the defendant requested the government to produce records showing that these individuals requested to have taxes withheld from their TCM payroll checks. Although the government does not have such information in its possession, the government did call a finance person at The Children's Museum who indicated that such information could be researched if given sufficient time, but further explained that even had an employee had claimed "0," indicating no exemptions on their form 1099, some amount of taxes would always be taken out.

level of 21, the resulting advisory guideline sentencing range is 37 to 46 months. The applicable fine range is $7,500 to $75,000. (U.S.S.G. §§ 5E1.2).

### III. Sentencing Recommendation

Pursuant to the terms of the parties' plea agreement and for reasons that will be more fully argued at the sentencing hearing under 18 U.S.C. §3553(a), notably the defendant's earlier similar theft from her previous employer, Massachusetts General Hospital, the government recommends that the Court impose a sentence at the low end of the applicable advisory guideline sentencing range – imprisonment of 37 months. Consistent with the plea agreement, the government further recommends restitution in the amount of $293,160 to The Children's Museum and the below-enumerated individual victims; a special assessment of $900, and two years supervised release. (See Plea Agreement ¶ 4).

#### A. Restitution

The government seeks restitution in the amounts listed below:

1. The Children's Museum         $ 292,186.00
2. Virginia Zanger                    158.00
3. Stacie O'Callaghan                 553.00
4. Alissa Daniels                     263.00

With regard to restitution, the government is seeking restitution to The Children's Museum in the amount of $292,186, broken down as follows:

| | |
|---|---|
| Initial loss adopted in PSR dtd 3/24/05 as detailed in government's 1/21/05 submission (Tab A) | $ 206,521 |
| Additional loss due to gross/net adjustment | |

| | |
|---|---|
| detailed in government's 3/23/05 submission (Tab A) | $ 41,028 |
| Additional loss due to match to TCM payroll register records detailed in government's 4/27/05 submission (Tab A) | $ 14,556 |
| Additional loss due to repayment of funds to tax withholding victims detailed in government's 4/27/05 submission (Tab B) | $ 30,081[3] |

The requested restitution figure **does not** capture the loss to many victims – employees and former employees, coworkers of Ms. Bartlett -- whom she plainly victimized in her theft scheme. The government submits that in order to calculate the loss to these victims, the government would need access to the tax returns of each victim and then would have to calculate, based on those returns, the amount of the victim's loss. Under 18 U.S.C. §3663A(c)(3)(B), such a calculation would "prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. §3663A(c)(3)(B). For this reason, the government seeks restitution only for those individual victims (listed above) who presented in their victim impact statement a tax implication calculation based on their tax returns.

## IV. Defendant's Expected Departure Arguments

As of the time of the filing of this pleading, the defendant had not yet filed a sentencing memorandum. Under the terms of the plea agreement and as a result of documents forwarded to the USPO and copied to the government during the PSR process, the government anticipates that

---

[3] Attached as Exhibit B is a list of individuals and amounts already reimbursed by The Children's Museum to victims of the tax withholding part of the scheme, totaling $17,575. The remaining amount is to be reimbursed shortly.

the defendant will seek a departure downward from her guideline sentencing range on the ground of extraordinary family circumstances. For the reasons set forth below, the government opposes a departure on this ground but may chose to supplement this argument once it has considered the defendant's sentencing memorandum.

As the government understands her argument, Bartlett intends to move for a departure asserting that the care she provide to her son, Ryan, is "irreplaceable," as supported by the April 8, 2005 letter from William Hevener. Even conceding for the sake of argument that Ms. Bartlett provides the best care of Ryan, superior to the care provided by Ryan's father, she fails to present any facts that constitute extraordinary circumstances warranting a departure.

In United States v. Pereira, 272 F.3d 76 (1st Cir. 2001), the First Circuit made clear that family hardship is, unfortunately, neither atypical nor unusual when a family member is incarcerated. For this reason, such hardships – without more – cannot justify a departure under § 5H1.6. Pereira, 272 F.3d at 80-83. By way of illustration, the First Circuit cited in Pereira to a series of appellate cases in which considerable family hardships – both financial and emotional – had been deemed insufficient to take defendants out of the "heartland." The cases included situations such as: (1) the imprisonment of both the mother and father of a four-year old child, United States v. Carr, 932 F.2d 67 (1st Cir. 1991) (not extraordinary; vacating departure); (2) a defendant with a neurologically impaired nine-year old son and a wife with fragile mental health, United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996) (not extraordinary; vacating departure); (3) a defendant who was a single mother and the sole provider for five children, one of whom had a substantial neurological impairment, United States v. Sweeting, 213 F.3d 95 (3d Cir. 2000) (not extraordinary; no departure); (4) a defendant who supported three children and had a wife with

7

depressive disorder and panic attacks, <u>United States v. Goff</u>, 20 F.3d 918, 921 (8th Cir. 1994) (no departure warranted); and (5) a defendant who was a single mother with three children under the age of four, where incarceration could require placing the children in foster care, <u>United States v. Dyce</u>, 91 F.3d 1462 (D.C. Cir. 1996) (not extraordinary; vacating departure).

As the First Circuit held in <u>Pereira</u>, in view of the significant hardships that courts have deemed to lie within the "heartland," Ms. Bartlett cannot supportably contend that her situation should for some reason be found so uniquely exceptional as to fall outside that "heartland." Although incarcerating Ms. Bartlett will undeniably have an impact on her son, that is true in virtually every case involving a defendant who is a parent, even more the case where there is no other parent or appropriate caretaker. <u>E.g.</u>, <u>United States v. Carr</u>, 932 F.2d 67 (1st Cir. 1991)(vacating downward departure where defendants' responsibility to care for their four year old son was, by itself, neither atypical or unusual, even when both parents faced incarceration); <u>United States v. Dyce</u>, 91 F.3d at 1467-68 (vacating departure in case of single mother of four young children where family members would and could care for the children if the defendant was incarcerated).

The care Ms. Bartlett gives to her son is not "irreplaceable," particularly in light of the guardian ad litem, Doctor John Daignault's finding in making his recommendation of shared legal custody that *"both the plaintiff/mother and the defendant/father possess adequate parental capabilities, despite their personality limitations as outlined above, and that Ryan is emotionally attached to both of them."* GAL Report at page 21. Moreover, Dr. Daignault addressed the best psychological interest of Ryan in the event that his mother was incarcerated, recommending that primary caretaking of Ryan be temporarily transferred to the maternal grandmother who has

8

historically been a surrogate caretaker in the mother's absence, with continued visitation with his father. Id. at 23.

With respect to the asserted emotional impact of incarceration, that, too, exists in every case involving a defendant with a dependent. To the extent that Ms. Bartlett asserts that the impact here would be heightened by the fact that her son is having difficulty dealing with the divorce of his parents, the government notes that the list of cases cited in Pereira included several where appellate courts considered – and rejected – § 5H1.6 departure requests made by defendants who claimed that one or more family members, including children, suffered from psychological, neurological or other impairments. E.g., United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996) (no departure despite neurologically impaired nine-year old son and wife with fragile mental health); United States v. Goff, 20 F.3d 918, 921 (8th Cir. 1994) (no departure despite wife with depressive disorder and panic attacks and three dependent children); United States v. Sweeting, 213 F.3d 95 (3d Cir. 2000) (no departure despite child with substantial neurological impairment for whom defendant was sole provider).

The government does not mean to deny or diminish the impact that incarcerating Ms. Bartlett will have on her family. "[I]t is the unfortunate norm that innocent family members suffer considerable hardship when a relative is incarcerated. As this Court has noted, '[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." Pereira, 272 F.3d at 81. Ms. Bartlett has failed, however, to establish that her situation is exceptional, particularly when one takes into account the other cases in which arguably greater hardships have been deemed insufficient to warrant departures.

## CONCLUSION

For all of the foregoing reasons, the United States requests that the defendant be sentenced within the advisory sentencing guideline range as specified above.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Diane Freniere
Diane C. Freniere
Assistant U.S. Attorney
United States Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210
(617) 748-3155

Dated: May 6, 2005

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by hand delivery to:

Karen A. Pickett, Esq.
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108

USPO Martha Victoria
U.S. District Court
District of Massachusetts

This 6th day of March, 2005.

/s/ Diane Freniere
DIANE C. FRENIERE
ASSISTANT UNITED STATES ATTORNEY