UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10297-RWZ |
| | ) | |
| NICOLE N. BARTLETT | ) | |
| | ) | |
| | ) | |

## DEFENDANT NICOLE N. BARTLETT'S SENTENCING MEMORANDUM

"You see [,] Nicole has always lacked armor - and when you grow up in a battle zone - that absence can be damaging."

> - Unsolicited letter from Ms. Bartlett's brother, Joe Bolduc, received by counsel on November 7, 2003.[1]

This sentencing memorandum is submitted on behalf of defendant Nicole N. Bartlett ("Ms. Bartlett").

## FACTUAL BACKGROUND

Ms. Bartlett is a 44-year old divorcing mother who has been awarded sole physical and legal custody of her 9-year old son Ryan.[2]  Without reiterating the personal background information

---

[1]Mr. Bolduc's letter, as well as other letters provided in aid of sentencing, have been submitted under separate cover entitled "Defendant Nicole N. Bartlett's Letters in Aid of Sentencing" ("Letters"), filed herewith.

[2]It is important to note that, although Ms. Bartlett did not seek sole physical and legal custody in the early stages of her divorce proceeding, the Probate Court awarded it nonetheless.  Letters, Letter of C. Michelle Dorsey, Esq., at 2.  "The granting of sole physical and legal custody to a parent who has not explicitly sought such at the temporary order stage is unprecedented in my twenty-two years of practice in the Probate and Family courts.  There is a legislative presumption that parties will share legal custody of their children during the pendency of a divorce."  Id.  See, also, infra at 8.

contained in the PSR, the story of the virtual <u>inevitability</u> of Ms. Bartlett's crime can best be told

through the eyes of her siblings and their description of growing up in the family home.

Ms. Bartlett grew up in a family home where alcoholism and violence predominated.

> Worse perhaps than living under a constant barrage of attacks, of combat, of violence - was
> living under the threat of impending violence. We never knew when things might explode. A
> tone taken that set my father off - a look that he didn't like. You would lay in bed at night
> waiting for the violence to erupt... wondering whether it was coming into your room - or -
> would it pass you by -and worse yet be inflicted on one of your siblings.

Letters, Unsolicited Letter of Joseph Bolduc dated November 7, 2003. Ms. Bolduc's mother and

siblings report that her father's alcoholism pervaded family life, making childhood memories

"unspeakably bad." <u>Id</u>. Nicole and her family witnessed bloody beatings, causing Ms. Bartlett and her

brother to hide under beds. <u>Id</u>. Predictably, family finances were also ignored. Letters, Letter of

Beatrice Bates (Ms. Bartlett's mother), undated, at 1. Bills went unpaid, which caused the electricity

in the family home to be shut off, and bill collectors to knock on the front door. <u>Id</u>. Ms. Bartlett's

mother sums up the mood in the family home as one of "abasement, feelings of helplessness and

hopelessness; the accompanying fear all bearing down to make you feel worthless...." <u>Id</u>.

While it appears that each family member's reacted to the violence and instability in different

ways, unfortunately, Ms. Bartlett's coping mechanism resembled most of the home's dysfunction:

> My sister Michelle and I developed our own methods of coping - but Nicole - somehow didn't.
> When she was personally confronted with anger and confrontation as a little girl - she would
> simply shut down. She would cry -but no noise would come from her - and she would
> invariably run and hide under her canopy bed. I usually would climb in after her and try to coax
> her out - or comfort her - and tell her that she was safe and that everything would be okay.
> Generally during these episodes she said nothing.

Letters, Unsolicited Letter of Joseph Bolduc dated November 7, 2003, at 1. According to Ms.

2

Bartlett's uncle, during her formative years, Ms. Bartlett "found succor by going into her bedroom and creating her own little world to shut out all this turmoil. There is no doubt in my mind that Nicole began to develop her own imaginary world...." Letters, Letter of Paul Donohue dated February 19, 2005. As Ms. Bartlett's mother has stated, "[w]riting these letters and remembering such traumatic incidents has been extremely stressful and when my older daughter and I were talking about this the other day, she made a very telling comment about Nicole – 'she never did find her voice.'" Letters, Undated Letter of Beatrice Bates, at 2.

As Ms. Bartlett advanced into her teen years, her father's abuse continued and he demeaned the females in the family by calling them "whores." Presentence Report ("PSR") at 11. He constantly told Ms. Bartlett and her sister that they were not smart or beautiful enough. *Id.* Perhaps most taxing on Ms. Bartlett was her discovery that her father was having a sexual relationship with her 15-year-old best friend. *Id.* Ms. Bartlett's mother "retreated" to the safety of friends' homes, leaving Ms. Bartlett and her sister with her father. *Id.* Eventually, Ms. Bartlett's parents underwent a nasty and bitter divorce with her father threatening to take Ms. Bartlett with him. Letters, Unsolicited Letter of Joseph Bolduc dated November 13, 2003, at 2. As a result of the horrors suffered at the home and the expectation that the Bartlett children would lie to "make the world believe that everything was okay," Ms. Bartlett and her siblings learned to develop strong denial skills. *Id.*

During her teenage years, Ms. Bartlett also became involved with Greg whom she ultimately married. Unfortunately for Ms. Bartlett, her "escape" from her childhood home led her to another situation of both physical and emotional abuse. PSR, at 12; Letters, Unsolicited Letter of Joseph Bolduc dated November 13, 2003, p. 2. She and her first husband ultimately divorced, after Ms.

Bartlett obtained a restraining order against him. PSR, p. 14.

During her marriage to Greg - - and from approximately 1981 to 1991- - Ms. Bartlett was employed by the Massachusetts General Hospital ("MGH") in the payroll department. Judith Chevrette, the former payroll supervisor of MGH, informed the town of Cohasset (one of Ms. Bartlett's subsequent employers) in 2003: "Nicole treated people well, of all backgrounds. She said that Nicole could resolve conflict well. She emphasized that working in the payroll department, there would be conflict regarding paychecks and she handled it well. Judith stated that she always gave Nicole good evaluations and could not think of any flaws."[3]  *See* Cohasset Police Department Criminal Investigation Division Background Investigation Dated May 5, 2003, attached hereto at Exhibit 1.

Following her employment at MGH, Ms. Bartlett began working as an independent contractor for RMM Associates where she organized files needed to prepare for the sale of banks that had been placed into receiverships; she had "an excellent record with RMM." PSR, at. 19. It was during her employment with RMM that Ms. Bartlett met her second husband, Timothy Bartlett, with whom she initially enjoyed a good relationship. PSR, at.14.

After the Bartletts purchased their first marital home, Ms. Bartlett became pregnant with Ryan. According to Ms. Bartlett's niece, family members knew that Ms. Bartlett would be a wonderful mother because she had already made her nieces and nephews "feel so special and loved." Letters,

---

[3]     The government has asserted that Ms. Bartlett ended her employment at MGH as a result of a claim that she embezzled money. The government's proof on this is completely lacking and is also contradicted by the foregoing unreservedly positive reference from Ms. Bartlett's MGH supervisor. There are no written records of Ms. Bartlett's employment at MGH, because the hospital purges them after five years. *See* Exhibit 1. We respectfully request that the Court discount the government's claim of impropriety.

Letter of Kathryn B. O'Donnell dated March 15, 2005, at 1. During the pregnancy, however, the Bartletts relationship became seriously strained, and he made no concessions for her difficult pregnancy. According to Ms. Bartlett's brother: "I recall my sister telephoning me and crying at a difficult point in her pregnancy with their son Ryan. The doctors advised bed rest and limited physical activity. Tim had come home from work and admonished her for not vacuuming – and rather than fighting back – Nicole picked up a vacuum cleaner and dragged it upstairs" Letters, Unsolicited Letter from Joseph Bolduc Dated November 13, 2003, at 3.

During her pregnancy with Ryan, Ms. Bartlett was employed (as she had been since 1993) with Fresenius Medical Care where she was a payroll supervisor. Mike Levine, the Divisional Assistant Controller for that company has stated that "Nicole treated people very professionally. He said that working in the payroll department, there was sometimes conflict and that she handled it well. He said that Nicole had a calm demeanor and handled stressful situations well. Mike said that the only flaw that Nicole might have had was that she was not well versed in all types of computer software..." Exhibit 1

Ms Bartlett found her raison d'etre in February 1996 upon the birth of Ryan:

> Nicole was always the sole caregiver to Ryan. Her son was her responsibility and all that entails from the time she came home with him from the hospital. She was responsible for doctor appointments (well and sick), eye specialists (and the home therapy that entailed), his daycare (I only watched him 3 full days as I worked the other 2)....From daycare to school, homework, extracurricular activities, shopping for the home and for her husband and son's everyday needs, cleaning the home and preparing meals nightly; then bathing Ryan and preparing for the next day by packing his food, medicines and clothing. She never complained about the extra work that a child brought to her life; on the contrary on her days off, she would be delighted in bringing him along.

Letters, Letter of Michelle Giampietro, dated February 25, 2005. Despite the joy that Ryan brought to Ms. Bartlett's life, he unfortunately caused a severe strain in the relationship between his parents. PSR,

at 14. Mr. Bartlett became jealous of Ms. Bartlett's extremely close relationship with Ryan. PSR, at

14. He also became very controlling of the family's finances – allotting Ms. Bartlett a certain portion of

the income she earned for expenses he deemed "necessary" and then taking the remainder of her check

for house expenses and/or retirement. PSR, at 14. He required Ms. Bartlett to keep a "log" of all of

her expenses. PSR, at 14. According to Mr. Bartlett's brother: "Nicole was expected to pay for

Ryan. Clothes, gifts, food. On several family occasions I witnessed, Tim would make Nicole pay him

for she and Ryan's share of the dinner." Letters, Unsolicited Letter from Joe Bolduc, dated November

13, 2003.

Although Ms. Bartlett will readily concede that in marriage, like bullfights, it is often difficult to

determine precisely whose ox is being gored, nonetheless, Ms. Bartlett predictably avoided confronting

her husband with feelings of "aloneness" with respect to child rearing and managing the family's

expenses. According to Stephen Shapse, Ph.D., a psychologist retained by counsel to evaluate Ms.

Bartlett, she "assumes a passive stance in relationships without conflict around the lack of self-assertion.

Self-assertion that might include disagreements, arguments, challenges and confrontations is not viewed

as constructive." March 17, 2005 Report of Dr. Shapse, appended hereto at Exhibit 2.

In September 1998, Ms. Bartlett began working as the payroll supervisor at the Children's

Museum when Ryan was approximately 2 ½ years old. PSR, at 19. It appears that fairly quickly into

her tenure at the Children's Museum, Ms. Bartlett began cashing "duplicate" checks issued to other

employees and engineering that checks be issued in employees' names which she would then cash.

Ms. Bartlett worked for the Children's Museum until March 2003. PSR, at 19. Over the course of

that time, Ms. Bartlett admits to having embezzled over $200,000. To be clear, Ms. Bartlett offers no

justification or excuse for her behavior, and has acknowledged her wrongdoing and the abuse of the

position of trust with the Museum.  Perhaps the only way to view her behavior  is as an "easy" and

destructive means for her to avoid conflict in her marital relationship and to provide herself and her son

with material comforts that she lacked in her own childhood.  In this regard, Ms. Bartlett is working

diligently with her therapist and has come to understand why she committed her crime:

> Through therapy, she understands that her history of trauma, although not an excuse for her
> behavior, has affected her decision making process in adulthood.  Before treatment, Ms.
> Bartlett would avoid conflicts with significant people by numbing her feelings and becoming
> submissive to their needs.  This is especially evident with her husband as she perceives men to
> be in a position of authority and she must be submissive to their requests or demands.  Through
> her work, she no longer believes this and is much less likely to violate her own moral code
> to either avoid conflict or to meet someone else's needs.  Continued therapy is needed to
> work on these core issues, and Ms. Bartlett is committed to working the issues through to
> resolution.

Letter of Donna E. McQuinn Brugnoli, undated, p. 1.[4]   As countless letters to the Court have regaled,

Ms. Bartlett has expressed extreme remorse, sadness and regret over her actions.

Mr. and Mrs. Bartlett physically separated in the summer of 2002.  Mr. Bartlett at the time was

providing a sort of informal, and very modest support for Ms. Bartlett and Ryan.  Mr. Bartlett knew of

her embezzlement and made clear to Ms. Bartlett that he would expose her behavior if she did not

capitulate to his demands for reduced child support and financial responsibility.  The parties eventually

appeared before the Probate Court where Ms. Bartlett was awarded sole legal and physical custody of

---

[4]        Both Ms. Bartlett's treating therapist, Dr. Brugnoli, and the consulting expert, Dr.
Shapse, have diagnosed Ms. Bartlett as suffering from post-traumatic stress disorder.  Ms. Bartlett (as
she committed in the plea agreement) is not offering that diagnosis as an "excuse" or "justification" for
her behavior, nor is she claiming that she was acting, during the course of her criminal conduct, with
"diminished capacity."

Ryan (even though she did not request it – an exceptional fact according to her divorce attorney, C. Michele Dorsey). Mr. Bartlett also was ordered to pay $375/week (which he has done in a timely manner). Ms. Bartlett and her step-father jointly purchased a small condominium in Marshfield where she lives with Ryan.

After the separation and while she was receiving the above-mentioned support, Ms. Bartlett began working in May 2004 as an administrative assistant and payroll coordinator for the Town of Cohasset (the "Town"). PSR, at 18. Prior to the entry of her plea, Ms. Bartlett advised the Town of her criminal conduct; she was immediately asked to resign. PSR, at 18. The Town undertook an extensive audit. Preliminarily, it was reported that there were two manual checks totaling $464 that should be investigated. PSR, at 18-19. Although Ms. Bartlett had committed no wrongdoing at the Town and had taken seriously, and with great pride, her job and responsibilities there, she was subjected very publicly to many questions. Ultimately, as Ms. Bartlett knew, the audit revealed that there was no wrongdoing whatsoever. See Cohasset Mariner article, dated April 1, 2005, and appended hereto at Exhibit 3.

Currently, Ms. Bartlett is unemployed. But, despite knowing of her conviction and circumstances, Donald Schnitzlein, owner/president of Don Juan's Salsas, is willing to offer Ms. Bartlett a full-time administrative position within his company. Ms. Bartlett wished to return to work and to meet her restitution obligations.

### RYAN BARTLETT

In August 2002, while the Bartletts were separating, Ms. Bartlett referred Ryan to a therapist, William Hevener, LICSW, because she



# REDACTED

Report of William Hevener dated April 8, 2005, at 1 ("Hevener Report").

His curriculum vitae has been provided to the Court, and reveals his twenty years of experience as a family therapist and that his eight years teaching the mandated parenting classes for divorcing parents called, "Parents Apart."

Mr. Hevener states

# REDACTED

*Id.*, at 2.

At present,

**REDACTED**

*Id.*

In July 2004

**REDACTED**

Despite the present criminal charges and plea, her still-unresolved divorce proceeding, and the

---

[5]    Ms. Bartlett submitted this report to the government, and the government, in turn, has submitted it to the Court.

**REDACTED**

10

blunt and embarrassing publicity she has received, the support letters, without fail, discuss what an amazing parenting job Ms. Bartlett is doing. For example, Ryan's school adjustment counselor, Mary Fitzgerald, M.Ed states:

> I have found Nicole to be a caring, conscientious, concerned mother who has always presented as having Ryan's best interests at heart....It was obvious to me that they have a mutual loving relationship....In my opinion, Nicole is a fine parent and a loving mother to Ryan."

Letter of Mary Fitzgerald, M.Ed., dated April 12, 2005 (previously submitted to the Court). "Before this news hit the press, Nicole preemptively went to Ryan's teachers, to her neighbors, to the parents of Ryan's friends, to explain what was happening and enlist their aid in keeping his young world as whole as possible." Letters, Letter of Joe Bolduc dated February 20, 2005.

Neighbors, too, have requested the opportunity to write letters to the Court to describe what a wonderful mother Ms. Bartlett is to Ryan, what a kind and generous boy that he is, the special relationship that they share and their contribution to the life of the community. *See, e.g.,* Letters, Letter of Marion McLaughlin, dated February 23, 2005 ("This young boy has a very good heart just like his mom Nicole. We have had 50+ inches of snow this winter. Ryan and his Mom clean off our cars and shovel our walkways after each storm."); Letter of Courtney Andrade, undated ("I consider myself lucky to know her and strive to be the mother she is....*Her son is her world* and she would do anything to show him how much he means to her. I doubt that you could find a child who feels more loved...) (emphasis added): Letter of Donna Rand, dated April 5, 2005 ("I am aware of the problems she had and I felt I needed to write the court a letter regarding the woman I know. I admire the love she exemplifies for her son...I really pray that this woman will be able to stay in our small community and live her life with her son and not be separated from him."); Letter of Stephen Robicheau ("I have

11

observed how Nicole and Ryan interact together as mother and son. She is, without a doubt, a wonderful, caring mother who puts the welfare and care of her child before anything else in her life."); Letter of Dominic Ferrante ("Many things have happened with illness and the weather that I needed help. Nicole was always there with Ryan to help shovel out my car and the walkway. He is such a great kid, and it would be tragic to separate them."); Letter of Kathy DiBenedetto, dated April 5, 2005 ("I feel Ryan would be destroyed and suffer for the rest of his life without the love and guidance of his mother Nicole ... Please. I pray do not destroy Ryan.")

As Ms. Bartlett's divorce attorney has stated concerning what can be characterized, at best, as a rather ugly divorce:

> Although there were times when Ms. Bartlett could have capitulated regarding issues that involve Ryan, thus making her own life easier, she never once compromised Ryan's best interest for her own. Even when she became the target of a criminal investigation, Ms. Bartlett remained steadfast in her commitment to do what is best for Ryan, never once even considering what would serve her own interest before that of her son.

Letter of C. Michele Dorsey, Esq., at 2.

Finally, Ryan's therapist has put it the most bluntly:

# REDACTED

Hevener Report at 4.

## ARGUMENT

On January 12, 2005, the United States Supreme Court decided *United States v. Booker*,

125 S.Ct. 738 (2005). In the constitutional opinion authored by Justice Stevens, the Court held that

sentencing under the Guidelines based on judicial factfinding by a preponderance of the evidence

violated the Sixth Amendment right to jury trial because it mandated sentences that exceeded the

maximum authorized by the facts established by a plea of guilty or a jury verdict. In the remedial

opinion authored by Justice Breyer, the Court excised 18 U.S.C. § 3553(b)(1) (making the Guidelines

"mandatory"), and 18 U.S.C. § 3742 (the standard of review which "depends upon the Guidelines'

mandatory nature"). *See* 125 S.Ct. at 756-57.

This Court now must consider the Guidelines, as but one factor, within a larger framework of

factors set forth in 18 U.S.C. § 3553(a). *Booker*, 125 S.Ct. at 757, 764, 766, 767, 768. Thus, the

Court must consider "the nature and circumstances of the offense and the history and characteristics of

the defendant." 18 U.S.C. § 3553(a)(1). The Court's sentence must be "sufficient, but not greater

than necessary," to fulfill "(2) the need for the sentence imposed - - (A) to reflect the seriousness of the

offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford

adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant;

and (D) to provide the defendant with the needed educational or vocational training, medical care, or

other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). This Court also

must consider "the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Finally, the Court

must consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

## The Guidelines

Ms. Bartlett has submitted her objections to the Sentencing Guidelines as calculated in her case. The only real area of dispute, at least under the final version of the PSR, is the number of "victims." Ms. Bartlett objects to the government's characterization of *all* employees, whose names were on checks cashed by Ms. Bartlett, as "victims." In order to qualify as a "victim" pursuant to U.S.S.G. § 2B1.1(b)(2), a Children's Museum employee would have to sustain an "actual loss." *See* Application Note 3(A)(i) to U.S.S.G. § 2B1.1. Employees whose "duplicate" checks were cashed by Ms. Bartlett always received their proper wages. Moreover, for the most part, taxes were withheld from these duplicate checks so that these employees did not suffer adverse tax consequences. Although the government has claimed that there are a number of employees for whom tax withholdings were not made on "duplicate checks," the government has not shown that these employees were subject to tax withholding (many of the Museum's employees were part-time students, seasonal employees, etc.). or that they incurred any tax loss (because employees need to make a certain amount of income before they incur tax liability at all).

The government, in any event, has the burden of establishing the victim enhancement under the (now advisory) Guidelines. *See, e.g., United States v. Garcia-Morales*, 382 F.3d 12, 19 (1st Cir. 2004).[7] The government has admitted that the "loss calculations vis-a-vis the individual employees are

---

[7] In the plea agreement, Ms. Bartlett agreed that this Court should determine the number of victims pursuant to a preponderance of the evidence standard, and she stands by the plea agreement. Recently, however, and after *Booker*, a court found that, even in an "advisory" Guidelines scheme, it would apply a "beyond a reasonable doubt standard" to determine whether a sentencing enhancement applied, and that there "is no authority to support the contention that a defendant can consent to a change in the burden of proof...." *United States v. Kelley*, 2005 WL 323813, * 5 (D. Neb. 2005).

nearly impossible to calculate without the employees' tax returns...." The government has not, and cannot, meet its burden of proving the assertion that *all* employees were "victims" for Guideline purposes.

Ms. Bartlett agreed in her plea agreement that the offense involved more than ten, but less than fifty, victims. U.S.S.G. §2B1.1(b). Under the circumstances, and given the admitted complexity of the victim-loss analysis and the government's inability to sustain its burden with respect to this issue, Ms. Bartlett believes that a range of victims between 10 and 49 is reasonable and fair. *Cf.* Application Note 2(C) to U.S.S.G. § 2B1.1 (court need only make a *reasonable* estimate of the loss).

If the Court determines that the number of victims is between 10 and 49, Ms. Bartlett's total offense level would be a Level 19, with a corresponding Guideline range of 30-37 months.

Moreover, to the extent that under a non-mandatory Guidelines regime, a "downward departure" argument remains, Ms. Bartlett asserts that she is entitled to a downward departure on the basis of extraordinary family circumstances, *viz.*, that she is the irreplaceable caretaker for her son Ryan, pursuant to U.S.S.G. § 5H1.6. "A downward departure for extraordinary family circumstances may be appropriate where the care provided by the defendant is irreplaceable or otherwise extraordinary." *United States v. Roselli*, 366 F.3d 58, 68 (1st Cir. 2004) (internal quotations and citation omitted).

Based on the standards set forth in *Roselli*, Ms. Bartlett's counsel asked Ryan's treating therapist of almost three years, to answer certain questions to assist the Court in its determination whether a downward departure for extraordinary family circumstances should be granted. *See* Letter of Peter Gelhaar to Mr. Hevener dated March 22, 2005, and attached to Hevener report. Hevener

opined unambiguously (at 3-4) that Ms. Bartlett's care given to her emotionally disturbed son is truly

# REDACTED

Hevener Report, at. 3 (emphasis added).

# REDACTED

In short (and tragically), this case presents the rare instance where a downward departure for

extraordinary family circumstances is (or would be under a mandatory Guidelines regime) justified.

The Nature And Circumstances of the Offense And The History and Characteristics of the Defendant

Under its 18 U.S.C. § 3553(a) analysis, this Court should consider the nature and

circumstances of the offense and the history and characteristics of Ms. Bartlett.

Concerning the offense, there can be no doubt that Ms. Bartlett committed an extremely serious

crime that affected not only her employer, The Children's Museum, but its employees as well. The

crime occurred over a long period of time and involved an abuse of her position of trust. As expressed

---

# REDACTED

16

by several employees, the discovery of what Ms. Bartlett was doing made them feel extremely violated.[9] Ms. Bartlett has expressed extreme remorse over her crime and her desire to make restitution in full to all victims of the offense.

Concerning the history and characteristics of Ms. Bartlett herself, Ms. Bartlett requests respectfully that the Court acknowledge her very traumatic and abusive upbringing during which she learned extremely poor coping mechanisms (including lying and denial); the abuse she suffered at the hands of her two husbands (who, predictably, resembled her father in many respects); her lack of a criminal record; her ability to engage in employment in a law-abiding and constructive way; her good works in her community and for her friends and family, as attested to in the many letters submitted in her behalf; her extreme remorse over her crime and desire to make restitution; her past and continued commitment to rehabilitation since she left the Museum over two years ago, including long-standing employment at the Town; her commitment to counseling and treating the "core" issues that played a role in her offense; and the irreplaceable, support that she provides for her son Ryan.

As Ms. Bartlett's treating therapist has expressed:

> I am confident that Ms. Bartlett is not likely to repeat criminal behavior. She has developed resources to cope with her feelings of powerlessness and needs to continue in therapy to work on her core issues. The welfare of her son is of the utmost concern to her and thus she is determined to resolve her trauma history so that she can make responsible decisions for both him and herself.

---

[9]    One "Victim Impact Statement" from an employee of the museum, Thomas Lemere, however, states: "I am horrified at the prospect of Nicole being incarcerated. I am even more troubled by thoughts of what her young son, Ryan is going through. Ryan is a sensitive, only child and I know, from personal observation, how much he loves and needs his mother. It is these concerns and fears that have caused me so much worry. It would not be exaggerating to use the word despair."

Brugnoli Report, at 2. Ms. Bartlett has shown to the Court that, in the two-plus years since she left the Children's Museum's employ. and during the course of these criminal proceedings, she is abundantly capable of leading a responsible life and engaging in employment where she did not abuse a position of trust. As amplified in the letters submitted, Ms. Bartlett has been haunted by the fears of damaging her son by potentially being separated and by being cast in such a negative light in the local press. But she has forged ahead to make as good a life as she can for herself and for Ryan.

A recent case, moreover, from the First Circuit makes clear that this Court can and should consider Ms. Bartlett's personal circumstances and maternal responsibilities when fashioning an appropriate sentence for her. In *United States v. Gorshuk*, 2005 WL 895209, *2, the First Circuit found that the District Court, under a non-mandatory Guidelines regime, may find as important mitigating factors the armed bank robber defendant's "serious mental illness, maternal responsibilities and lack of a criminal record." The First Circuit was considering whether the District Court had appropriately granted the defendant a downward departure based on diminished capacity, but decided ultimately it need not resolve the issue "because, in a post-*Booker* world, the sentencing guidelines are only advisory and the district court may justify a sentence below the guideline level based upon a broader appraisal." *Id.* at *4. *See also United States v. Antonakopoulos*, 399 F.3d 68, 83 (1st Cir. 2005) (even if district court denied downward departure based on family circumstances, in a non-mandatory Guidelines regime the ground of family circumstances "is still open and is not frivolous." ).

<u>The Appropriate Sentence For Punishment, Deterrence. Protection of the Public and Rehabilitation</u>

Under 18 U.S.C. § 3553(a), a sentence must be "*sufficient, but not greater than necessary,*" to fulfill "(2) the need for the sentence imposed - - (A) to reflect the seriousness of the

offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Ms. Bartlett asserts that a sufficient sentence to meet the goals set forth in the statute is a period of probation with home detention including conditions that allow Ms. Bartlett to engage in employment (to meet, *inter alia*, any restitution obligations), attend to the needs of her son, and allow her to continue her counseling. As suggested by many members in her community, community service also could be included as a condition of her continued release. Home detention serves an appropriate deterrent, because it obviously involves substantial liberty losses, and, at the same time, can allow a defendant to work toward accomplishing obligations of restitution. It also allows for adequate protection of the public. After over two years of crime-free and productive living under stressful emotional and financial conditions (including work at the Town, which involved many of the same risks of abuse of position of trust as the Museum), it is difficult to imagine her as a "threat" to the public on a probationary term. Importantly, also, such a sentence would promote the most effective rehabilitation for Ms. Bartlett, who has continues to see her therapist, Dr. Brugnoli.

In short, although Ms. Bartlett's crime was admittedly and undeniably serious, she, her son, her community and, importantly, the victims in this case will benefit the most from a non-prison sentence.

Consistency In Sentencing

The request that Ms. Bartlett, a woman with no criminal record and who has conceded to embezzling over $200,000 from her employer, be granted a period of home confinement for punishment

19

would promote consistency in sentencing. Although it is hard to gauge what kind of sentences similar

offenders with similar backgrounds will receive under a non-mandatory Guidelines regime, Ms. Bartlett

offers the following references for comparison, at Exhibit 4:

- March 6, 2005 Boston Globe article:

  A California woman who pulled off an elaborate embezzlement scheme on two
  companies....was sentenced in federal court last week. Jennifer Marie Shurts, 39, of Temecula,
  Calif., was ordered by US District Judge Morris E. Lasker last week to serve five years
  probation and pay a total of $71,000 in restitution...The first three months of her five year-year
  probation are to be served in home confinement.

- September 7, 2004 Massachusetts Attorney General press release:

  A 14-year employee of the Boston Bruins organization has pleaded guilty to stealing more than
  $213,000 from the team by creating unauthorized checks from the organizations operating and
  payroll accounts and cashing or depositing them into her own personal accounts....Judge Janet
  Sanders sentenced Johnson to one year in the House of Correction, suspended, with five years
  probation.

- *United States v. Ribot*, 97 F.Supp.2d 74 (D. Mass. 1999): Judge Gertner finds the conduct of
  defendant, who embezzled almost $200,000, "aberrant," but explainable on the basis of mental
  health data, and sentences him to a period of thirty-six months probation, six months of which
  was in home detention with electronic monitoring.

The first two situations above - - a post-*Booker* federal sentencing and a state sentencing –

demonstrate that a sentence that incorporates home detention/probation sufficiently addresses

punishment, deterrence, protection and rehabilitation concerns. Even under the "mandatory" Guidelines

regime, in circumstances where a defendant's behavior was "aberrant" and explainable by an

unfortunate background, a probationary sentence with home detention was found to be sufficient. Ms.

Bartlett urges the Court to view her requested sentence as one that would punish her similarly to those

who have committed similar crimes.

Need For Restitution

As asserted above, Ms. Bartlett desires to pay the restitution ordered by the Court in full. Unfortunately, as of the writing of this brief, the government has not provided to the defendant the backup documentation on which the government is seeking restitution and the defendant currently is unable, without her counsel performing due diligence, to determine the exact amount owed. Ms. Bartlett's counsel does note that in the final Presentence Report, the Probation Department found that the loss was $206,521. The government just recently has claimed that the restitution amount should be higher based on other factors. Again, Ms. Bartlett does want to make restitution in full, but cannot determine presently (without the additional information from the government which she has requested) the full restitution amount. In any event, her commitment to restitution is unwavering.

CONCLUSION

Based on the above factors, Ms. Bartlett respectfully requests that the Court sentence her to a period of probation, that includes a period of home confinement and community service.

Respectfully submitted,

NICOLE N. BARTLETT
By her attorneys,

Peter E. Gelhaar, Esq., BBO #188310
Karen A. Pickett, Esq., BBO #633801
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, MA 02109
Tel: 617-720-2880
Fax: 617-720-3554

**CERTIFICATE OF SERVICE**
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 5/6/05 Karin Pickett

DATED:        May 6, 2005

21